Case number 224033, Mary Whitlatch v. Belmont County OH at all. Argument not presented. Two minutes per side. Mr. Campbell, you may proceed for the appellant. Good afternoon, Your Honors. May it please the Court, my name is Bill Campbell. I represent Mary Whitlatch, the Administrator of the Estate of Elsie Leisure. I would request two minutes reserved for rebuttal. Very well. We're here on a motion for summary judgment that was granted in the District Court,  Our claim arises out of a violation of the Eighth and the Fourteenth Amendment. It's our position that Elsie, while incarcerated, was not provided the adequate care, and quite frankly, the evidence in this case, whether it's considered, he's considered a pretrial detainee or a prisoner under the Eighth or the Fourteenth, the totality of the circumstances establish that his rights were violated for failure to provide the adequate care. Counsel, when you use that phrase, failed to provide adequate care, that really isn't enough, is it? It has to be deliberate indifference. Yes, you're right. Lots of people get provided inadequate care. It's called negligence and medical malpractice. You're absolutely right, Your Honor. I appreciate that, and I misspoke, because if that's all that occurred here, then the ruling is correct. However, when we put it into the context of what took place, we know that his bond was revoked, his probation was revoked, and he was sent to the Belmont County Jail. He enters there on June 27th, and by July 2nd, the morning of July 1st, he dies. He's found, he's in his cell, on the toilet, dead from peritonitis, actually sepsis that developed because of peritonitis. Just a quick question. Yeah. Was he under sentence when his bond was violated? It's not clear, but he would have to be for the revocation of the bond to put him into jail. There would have to be something hanging over his head. No, there could be a charge, a bond with conditions, violate the conditions, your bond's revoked, you're now in pretrial detention. Do you know whether that's the case or whether he was under a probationary sentence and somehow he violated? And I don't know for sure. Well, doesn't it matter for the standard that we apply? It does. Whether it's going to be, I think if the, well, if the bond is revoked, regardless, and he's in prison, I think this falls under a prisoner, not a pretrial detainee. But regardless, the facts in this case establish a case. So certainly, whether or not a motion for summary judgment should be granted under either the 8th or the 14th, it's our position that it should be denied. There's sufficient facts when you look at the totality of the circumstances here to establish that. And I think that's important. And before I, you know, I don't want to be redundant with my brief, but there are certain facts that I think highlight that, and one in particular. But some of the things that testimony in this case is, is we know, first of all, that the nurses that are the defendants in this case, they are the ones that have the responsibility to contact the doctor or send an inmate out if need be, if it arises to that level. That's their responsibility. In this case, when you take a look at the facts, and we really are focusing on, and I think both sides are in agreement here, come the morning of June 1st, around 1044, is where the interaction begins with the nurses and continues through that day, through the night, until he's dead in his cell the following morning. Counsel points out in the appellee brief that there was quite a bit of interaction, at least 10 interactions with the nurses and with the decedent, and therefore this doesn't arise to the level of deliberate indifference. My position is just seeing him isn't enough. You have to take the information that is there in your face and make decisions. At what point, because you're exactly right, a number of things happen. The district judge calls it three examinations. There's some dispute, but at what point do you think it crossed the line? I think you picked the right point to start with. They have this examination, which we can look at, and there's a lot of stuff going on. Were they deliberately indifferent when they didn't send him out at that point? Was it later on in the day when they were told he was spitting blood? What's your best shot at where that line is? I think it actually begins with him, which you can see on the video, and him hunched over. This isn't GERD. I have GERD. I've had GERD. As a matter of fact, you're not hunched over because of GERD. You're not. The testimony in this case from Nurse Butler was that he did not exhibit the classic signs of withdrawal, whether it's from heroin or alcohol, both of which he was addicted to. You can rule out those other things, and we can quibble over what the video shows in this case, but that's why there's an issue of fact to be determined here. You haven't really answered my question of where would you put the line. Can you even bound it? That's why I started out by saying as soon as they had the 1030 exam, were they deliberately indifferent at that point? No. I think at that point in time that the initial examination, even though he was exhibiting some significant signs, was sufficient. When that continues and progresses, then I think we've crossed the line. But in particular, at 1044 at night, when he's screaming out that he's in so much pain that he's going to kill himself, that the line is crossed to a great extent here. Keep in mind, this is not somebody that's considered a psychotic that's claiming he's going to kill himself. This is not somebody that is complaining of he's depressed and he's going to kill himself. This is somebody that expresses he's in so much pain that he's going to kill himself, something that he hadn't done over the course of the many days that he was there. And with the building of the problem on that particular day, keep in mind, they're taking him back and forth to the med cell, back to the cell itself, but essentially just giving him aspirin and some antacid. But once we get to the point where he's crying out he's going to kill himself at 1030 at night or 1040 at night, I think at that point in time, the nurse has to send him out. And that's after the two reports of spitting up blood, is that right? That is correct. That was that evening during dinner time and so forth. The other thing is the testimony of the nurse in particular, when I asked about the policy. Say the nurse. Do you mean English or both? Yeah, that's what I was going to like to see. I apologize. It was English. I asked her about the policy when to send out a detainee, a prisoner, and one of the things she said, if we're uncomfortable with what's going on with the distress, we'll send him out. Apparently when he's crying out he's going to kill himself if she wasn't uncomfortable. I guess that's what her argument would be. If they don't have a good understanding of what the problem is, well, we know it's not GERD. We know it's not the classic signs of withdrawal. Say it's not GERD just because the hunching over is different? GERD is an upper gastric issue. GERD shows signs of heartburn, which is obviously the classic one, coughing, dryness. But it's up here. It's not down here. I've never been bent over because in the 10 years I've had GERD it's never caused me to be bent over in pain, which I think is clearly depicted multiple times on the video and the interactions with the nurse. But they just keep feeding him an antacid. But back to it, the third and last thing is nurse English said that even though you may have an understanding of what is going on, but had some concerns that something could not be appropriately dealt with, jail policy is to send him out. Even violating policy isn't usually deliberate indifference. But it's the totality of the circumstance. Is there anything in the record that would point affirmatively to deliberate indifference? We've seen a lot of these cases. You may have litigated a lot of them. A lot of times you have the guards sort of nudging each other and laughing and things of that sort. I didn't really see anything in the record. It's all negative as well. She looked in and she should have noted something, but she didn't. It's our position, and we believe the case law supports this. You're right, she doesn't come out and confirm, yes, I ignored and made the decision not to do that. Nor is this a situation where she physically attacks. Or they've been attacking her. Something of that nature, right. This is a situation where it's our position that the ten interactions or more cuts both ways. It's in her face what's going on here. It's in our face when we look at the video. And then it certainly is ramped up when he's threatening to kill himself because of pain. So, you know, at that point. Because I read the transcript and the quote, he calls and says I'm going to kill myself, period. And that's why they take him out and take him through the suicide protocol. Then the question of what he says about the cause is all kind of secondhand from Officer Smith, sorry, yeah, Weeks, Gina Weeks Smith. She's the one that actually moves him back and forth, and she's the source of whatever it was that he said. Is that fair? My recollection from the testimony, and I don't have it in front of me, I apologize, from the nurses, that they confirmed that his complaints of wanting to kill himself was because of the pain he was in. Confirmed was confirming what Smith says. That is, I did not read it that they heard him say anything. They said we talked to Smith or Smith Weeks. Is that fair? That's fair. Regardless, again, nurses can't make diagnoses. Well, was it because of, I read he didn't say it was from withdrawal? He was there, well, he was telling them early on in his incarceration that he was going through withdrawals, and that causes him to be ill. But again, the signs that he's exhibiting on the first are not the classic signs of withdrawal, and that's admitted by the nurse in the testimony. Isn't it admitted that what they were witnessing was not the signs of GERD? I mean, you're telling us it's not, but. I think they abandon that. And they give him that antacid and so forth early on the first. But as things progress over the course of that day, clearly what is causing him significant pain leading up to his claim of death is not GERD. I don't know if I posed that exact question to the nurse. Did you realize by such and such a time that his complaints of pain were not GERD-related because he was complaining of abdominal pain? I did ask about the withdrawal question, but I don't recall asking that question. But it's, again, nurses can't make a diagnosis. That's why they have to either call the physician or send him out, just as though an inmate can't make a diagnosis. Him coming in and saying, I have GERD or I have withdrawal symptoms, and you can just count on that throughout his incarceration and just ignore, and I mean ignore everything else. He cannot self-diagnose himself. The nurses can't diagnose what's going on here. That's why they need to send him out. I can't go into a malpractice case in the state of Ohio and put a nurse on the stand and tell me what caused the injury or the death. It's not permissible. Just like in the medical field, a nurse can't do that either. That's why they're supposed to send him out or call the physician. Can we not take into account the fact that the nurse Butler checked in on Mr. Leisure after he had been returned to his cell at around 1110? It looks like she checked in about three times and recorded him as sleeping and restful. Is that not relevant to the analysis here? I certainly would agree. Again, when you look at the video here, there are times where he's sleeping. There are times where he's tossing and turning. There's times where he's hunched over completely. There's times where he's- What are the times when he's hunched over? From the 1044 in the morning when he's brought into the med station, the medical, he is bent over in his chair. He's not sitting up. And then when you get further into the day, the med pass, it's our position that if you look at that, and I know counsel has a different take on this, but this is why I think a summary judgment is not appropriate, is he's leaning up again. He's propping himself up to get some medication. He's clearly in distress. And this is not withdrawals as they admit to, and this is not simply GERD. There's something else that's in their face going on. And then when you take that forward to 1034 at night when he's going to kill himself over this, they have the requisite information. They chose to ignore it, and that's why, not surprisingly- That 1034 time, and help me with this, because when I did look at that video and some of the accompanying depositions, he really doesn't get any medical evaluation at that point, does he? He's brought because of the suicide protocol, and then he's just taken back to the medical cell. Is that fair? But Butler and English aren't on site in those videos. They talked to Smith at somewhat later point. I mean, maybe that's plus, maybe that's minus. But do I have that right, that they don't-they're not really on scene when we see that video where he's sort of waiting there at the office, and you see this officer, and then she takes him back to the medical cell. Is that correct? That's correct. But they were the ones that made the decision to send him there and not to send him out at that time. So they were aware of his threat, and they were aware, obviously, of what transpired leading up to that and still made the unforgivable decision of not just-just send him out. This is not rocket science. You can't make a diagnosis. Something's going on here, and it's right in your face, and they deliberately chose to do practically nothing. They check his-yes, they check his vital signs. His vitals are, you know, are fine. That seems to be what, you know, they're hanging their hat on, that they're doing a sufficient-my position is, or Plankton's position, Pelk's position, is that there was a lot of interaction, but it was pointless interaction. It was cursory interaction. Basically, he's complaining about pain, and it were-he's exhibiting pain by being bent over, and at some point there was-he was-I don't know whether it was actual vomiting or spitting up blood, but we had that. So their response was to see if he was in some sort of emergent situation and did that by doing-by checking all of his vitals to see if there was any indication that there was something going on that they should be aware of. So what's the problem with that? It's not foolproof. It's- I'm sorry. It's not foolproof by any stretch. The idea when you have somebody in excruciating abdominal pain, when you have somebody that's making, you know, threats to kill themselves because of the increasing pain, and you yourself have ruled out the other things on the differential diagnosis that might have played a role, that the idea his vitals are fine, but we're going to send him out makes no sense. The other thing is- One second. I'm sorry. Just give me where, or you can do it on rebuttal, exactly where you've established that they ruled out withdrawal and GERD by the end of the day. It was in the testimony. You can do it on your rebuttal. Okay. Yeah, I apologize. I wish I could. But what they did, and I don't, you know, what her testimony was is that he wasn't showing classic signs of withdrawal from heroin or alcohol. So that, I certainly would think that would be before the 1030ish time when he threatened to kill himself that she's aware of that. I apologize. I don't have that there. Okay. I think you've got your rebuttal time. Thank you, Ron. Thank you. May it please the Court, my name is Andrew Yasowitz, and I represent Appley's Tiffany English and Deborah Butler. The first thing I want to do, we've talked a lot about facts. I want to talk about law. But I do want to correct the record. And I trust the Court will read the record thoroughly. The spitting blood, that was an intercom call to the corrections officers. Okay. So the intercom does not go to the nurses. It goes to the corrections officers. The nurses don't hear that. So that was an intercom call from Mr. Leisure's cellmate that said that Mr. Leisure was spitting up blood. Is there any evidence that that was true? No. Even their expert, Dr. Poverino, admits that there's nothing that was found either on autopsy or in the record of this case that would explain that or cause him to spit up blood. That's the only mention in the record of spitting up blood? Yes. The one call from the cellmate to the jailers. That's at what time? It's about 525? I think that's about it. I thought there was a second call at 739. There may have been more than one call. But the point is that was after the exam, for which we have no video, but there was apparently an exam at 625. And then there's another call, as I read the record, at 739 where the cellmate again calls and says he's spitting blood. I presume it's on the same phone line. So that's the same, but it's repeated after an exam has happened is the way I read it. Fair enough. The point is that that call doesn't go to the nurses. There's no evidence in the record that the nurses were ever told that. But that's the practice. And the officers then convey the information to the medical team. Well, we don't know what the officers conveyed to the medical team because the appellant didn't depose any of the officers. The nurses didn't know that information. We can't speculate and say, well, this is what they were told. There's no evidence that they were told that. The second is similar, the suicide. And he wasn't suicidal, but he calls the jailers, not the nurses, calls the jailers and says that he's suicidal. He's taken to the jailers. Sergeant Weeks, her name changed during the pendency of this case, so it was Sergeant Smith or Sergeant Weeks. There's a declaration from her in the summary judgment record as to what happened. She talked to him. Was he suicidal? No. What he told her was he was in pain and that he believed he was going through heroin withdrawal. And then he also said he wanted to use the staff bathroom. She said no, and she sent him back to his cell. It didn't involve the nurses. It involved the jailers. There's no evidence of what she learned from him being conveyed to the nurses. It's not in the record. And I read the deposition where one of the nurses, I thought pretty clearly, says she got information from Smith, right? She may have gotten some. I think she says that. I mean, if I define my piece of paper, but around 847, something like that? It was later. I think it was later. I mean, 847 page. I'm sorry. I'm referring to the page. Go ahead. If I find it, I'll answer it. Was there any evidence of the nurses being aware that he was in withdrawal? Well, other than he told nurse one, when he came in initially to the jail, now those nurses weren't the ones that examined him. But it would be in his chart, maybe? It was in his chart that he could go through withdrawal. I mean, his bond was revoked because he failed a drug test. And then later on that evening, he does tell nurse Butler that he uses heroin and he also tells her he's had stomach issues for months. And I think that's an important fact because that would lead a nurse to think, this is a chronic issue, not an emergent one. I want to turn, just in the time that I have remaining, to some law. We haven't discussed any law in this case. You know, there's two prongs to qualified immunity. Was there a constitutional violation? And if so, was the law clearly established under the circumstances? And public employees are entitled to qualified immunity unless the unlawfulness of their conduct was clearly established at the time. And that has to be defined at a high degree of specificity. The legal principle has to clearly prohibit the employee's conduct in the particular circumstances before him or her. The law must be clear that every reasonable official will understand that what he or she is doing is unlawful. The appellant, the plaintiff, has the burden to cite cases to this court to satisfy that burden of demonstrating that the law is clearly established. It's the plaintiff's burden to convince this court that the law is clearly established. The plaintiff has not done that here. The cases that the plaintiff cites, none of them are abdominal pain-type cases. The first case the plaintiff cites is Markham v. Scioto County. I was counsel on that case, so I know it very well. It was an asthma case. It has nothing to do with abdominal pain. And the appellant cites the magistrate's report and recommendation, which denied qualified immunity to the physician because the physician didn't properly monitor the asthma. Well, we objected, and the district court sustained our objection and overruled the magistrate's decision. So that's actually a case that supports qualified immunity. And importantly in that case, the district judge said, you know, the argument that they should have done more, which I think is the argument in this case, has repeatedly been rejected as a basis for deliberate indifference. They cite a case called Dominguez. That's a Sixth Circuit case. It's a heat exhaustion case. It has nothing to do with an inmate in abdominal pain. They cite Padula v. Trumbull County. That's an alcohol withdrawal case. And that was where a medical assistant was denied qualified immunity because the inmate had blood in her nose and ear, which indicated a possible head injury. The vitals were elevated, so abnormal. The inmate was sweating and incoherent. I think that's an important fact because it's undisputed in this case that nurses took sets of vital signs about eight hours apart, and they were not elevated or abnormal. So the eight hours apart is the 10 o'clock exam and then the 6 o'clock exam. That is correct. Since we're at that point, the deposition of Butler, she is saying, did you deduce from your conversation with Sergeant Smish that his complaint to kill himself was because he was hurting from withdrawals? That's what he told the sergeant. Then she says, I don't know why, but she says, I got all that from Smith. So clearly she was involved enough that she talked with Smith. Subsequent to Smith returning him to the cell at 10.50 some. Is that right? Okay, great. So Smith tells... And then apparently you were there because you objected a couple of times. So Smith tells Nurse Butler, but Nurse English has gone home by this point, and we can't lump the defendants together. You have to analyze them individually. All right, so Smith tells Nurse Butler that he says he's hurting because he's in withdrawal. And that he's hurting enough that he's going to kill himself. I mean, if you read the deposition, they have a conversation. They have a conversation about it, but it's pretty clear if you read Gina Weeks' declaration, she determined he was not suicidal. So she was not deposed, but she did give a declaration, is that right? She did. That's correct. So on this sort of negative differential diagnosis, your colleague agrees that he's not suicidal in the common sense, but what he says is, look, might be GERD, but you look at it, it isn't. It might be heroin withdrawal, but you look at it, it isn't. He might be a depressive suicidal, but it's pretty clear it isn't. So what should a nurse do at that point? Or are you saying that those are wrong, that he could have been any one of those? No. Rather than having, I take it, in fact, an unknown peritonitis, or at least not unknown, it is a not discussed peritonitis. Isn't that the truth of what happens? Well, it was. If they believed that he had peritonitis, they would have sent him to the hospital. If you read both English's and Butler's declarations, these are very experienced nurses. They've had experience with sepsis. And everybody agrees in this case, this case, this medical case, did not present as a typical peritonitis or sepsis case. The symptoms that you would associate with peritonitis or sepsis, elevated temperature, because it's an infection. Basically, you've got from one side or the other is kind of the negative inference. That is, they're saying he didn't have this, he didn't have this, he didn't have this. We're not sure what he has, but it's bad enough that you should have been sent. You're saying if it was peritonitis and they knew it, that would be deliberate indifference. But there's no sign of it. Therefore, they must not have been deliberate indifferent. That's right. We've got to choose between those views. Well, you know, so let's look at some law that helps us choose in that circumstance. You've got the Trozzi versus Lake County case. I know that the analysis has changed with that case. But at least it's instructive in that, you know, the court, this court, said in that case, a complaint of serious stomach pain, standing alone, would not lead a reasonable official to seek outside emergency help. That's an abdominal, you know, pain case that supports qualified immunity. Probably the best case for the defendants is Rouster versus County of Saginaw. So there you've got an inmate complaining of moderate to severe stomach pain. An abdominal exam revealed guarding, so not a normal abdominal exam. In contrast, in this case, and Judge Boggs, this is at the 625 examination, where Nurse English, or Nurse Butler does an abdominal exam, and it's normal. She says not tender or distended. Not tender or distended. So Rouster is different. There you've got abdominal pain. You've got an abnormal abdominal exam. And the nurse advised the inmate to increase his fluid intake, lie on his side. And then the inmate begins behaving bizarrely. And he gets hand tremors. And the nurse thinks that he's going through alcohol withdrawal. The part about acting childlike in the later note, any comment on that? Is that abnormal? I don't know. It's a subjective. Anybody deposed about that meaning? It is in the deposition. She was questioned about that. I mean, I guess let's think about what we have here. You know, we deal with, in law, objective and subjective facts. We deal with that in probable cause determinations. It doesn't matter what the officer subjectively knew or thought. It only matters what they objectively knew. Well, it's the same thing in medicine. You've got objective and subjective facts. You've got subjective complaints from the inmate. I'm in pain. I've got stomach. Well, then the nurses try to get objective facts. Well, what's going on here? Get vital signs. Those are objective. Vital signs are normal. We're going to examine your stomach. That's an objective. And that examination is at the exam that's not on a video. Is that right? It is not on a video. Do we have any? But there are some declarations or notes from it. Are those notes contemporaneous? Yes, those are contemporaneous. So you have both the nursing notes and then also their description in their declarations of what occurred during that time. But the nurses know or should know that they're not doctors and they're not able to make a diagnosis or reject diagnoses when a patient presents certain symptoms. So why is it up to them to decide, okay, he's complaining about pain, I've checked these different things, I haven't found anything, so there's nothing to do? Well, the nurses didn't make a diagnosis. That's not what happened here. What the nurses are assessing is, you know, an inmate complains of a stomach ache. Do they have to call the doctor right away? No, they're assessing whether there's an emergent need. Okay, but that was started in the morning. Now it's in the evening. It's been 12 hours, and they've done whatever they were planning on doing and it hasn't changed, and he's in such pain. Yes, he says it's withdrawal. He doesn't know what it's from. They know that it's not the classic withdrawal. Why didn't they have to call somebody? Well, you know, what you're, Judge White, what you're saying to me sounds a lot like a negligent type of situation than a deliberate indifference one. The deliberate indifference standard is they were aware or should have been aware that there was an excessive risk to his physical well-being. They were never aware of that. Perhaps they should have taken different actions or, you know, called the physician sooner, and that's what the judge in the district court said. Maybe they could have taken more aggressive action, but that's not deliberate indifference. That's at most negligent, and that's what we're here to determine. There's a state court malpractice action pending, so that will be for the state court to decide. I see that my time is up. I'd ask that you affirm the decision of the district court. Thank you. Thank you, counsel. Briefly, I had an opportunity to take a look at it. In Nurse Butler's testimony, the critical time late in the evening on the 1st, at 10.30 she testified that he's complaining of the inability to poop and acting childlike per defendant Butler. Per what? I'm sorry. Per defendant Butler. That's her testimony. Okay. That's how he's acting at 10.30. Twenty minutes later at 10.50, he is placed in mental health isolation due to threats of killing himself. That's Butler's testimony. What's the page reference there? That's 29-1 page ID number 467. Okay, good. That's exactly what I've got. And then at that point in time he's taken to the booking. Again, this goes beyond negligence. This is deliberate indifference. Here you have somebody in clearly excruciating pain that has progressed throughout the day to the point that you can't just do nothing. Certainly sending him to booking is more than just negligence. She's indifferent to what's going on to this young man. So where can you give me the page numbers where they acknowledge that he's not presenting with traditional GERD or with traditional withdrawal? I don't think I can give you the page numbers as I stand here right now. I can represent that that was the testimony, but I don't have that. I look for that. I don't have it written down, and I don't have it. So my apologies. The other thing that I would like to briefly touch on if I have a moment is counsel talks about that there's no cases about abdominal pain, and therefore there's not case law to support this. This is a fact specific as when you look at the cases. It's a variety of ailments that come into play. I don't think any of them talked about an inmate claiming he was going to kill himself because he was in pain. Do we ignore that fact? Is it irrelevant? I say not. With that being said, I submit that the district court's ruling on summary judgment should be reversed. Thank you. Thank you. We will take the case under submission.